The United States Court of Appeals for the Ninth Circuit is now in session. Good morning, everyone. Please be seated. We have Judge Beatty by video. Judge Beatty, can you hear us? Yes, I can. Thank you, Judge Rollinson. All right. The cases will be called in the order listed on the docket. The first three cases, Valdez-Reds v. Garland, Alejandre Valdez v. Garland, and United States v. Rand have been submitted on the briefs. The first case on calendar for argument is the consolidated case of Nude Nicotine and Lotus Vaping v. U.S. Food and Drug Administration. Which counsel is arguing first for the appellate? Good morning, Your Honor. Jared Nabar. I'll be arguing first. Okay. Please proceed. Okay. And, Your Honor, before I get into my time, we've each requested to split the time evenly, including on rebuttal, and I've requested two minutes, so eight minutes now, and then Mr. Heyer was going to go for eight minutes, and then each of us would split the rebuttal, and I'm not sure if that's – I see that the clock says ten minutes. You can set it for eight minutes. Madam Clerk, would you please set it for eight minutes? All right. Okay. Please proceed, Mr. Nabar. Okay. Thank you, Your Honors, and good morning. Jared Nabar for the petitioners, and may it please the Court. So, we have several arguments that the FDA's denial orders here were arbitrary and capricious and otherwise illegal, and I'm going to start and focus first on the lack of fair notice, the argument that it was arbitrary and capricious for lack of fair notice of the substantive evidentiary standard that the FDA expected the applicants to meet. And so, first, fair notice is a fundamental rule of administrative law. If the record reflects that the FDA changed the substantive evidentiary standard for these applications after the fact, then black-letter law would require a remand because our clients did not get fair notice of that substantive standard. And I want to be clear that this argument is not simply that certain modalities of studies, like an RCT or a longitudinal cohort study, were required. I'm acknowledging that even if you accept that the FDA reviewed so-called other evidence, whatever evidence was in the application on the health risk investigations, even if you accept that they substantively reviewed it, the record is incontrovertible that they only reviewed it with respect to a very narrow question. And if the applications did not include studies of a comparison between the at-issue products and a tobacco-flavored e-liquid product, then they did not proceed further in scientific review. Absolutely. May I ask you to drill down into that issue a little bit more? What exactly is the notice that you are advocating was not required, was not provided? Right. And so I agree with the FDA to the extent that in the FDA's brief, they represent that the 2019 guidance is the document that provided the PMTA guidance. And that's about a 52-page document that we've cited in our briefs. And I've quoted at length from it because the guidance said it has a section on comparison products. And it says that the applications are supposed to compare the at-issue products in the applications with other e-liquid products. And all it says is that, you know, the applicant should choose an e-liquid that's expected to be used in a similar manner. So why wasn't that sufficient notice? Well, so that's what these applicants did. But the problem was that that's not the standard that the FDA applied. They didn't review these applications to see, well, you know, based on the comparison product that you selected and you addressed in your scientific review, you know, what do we think of that evidence? They looked at the application solely to see if they included a comparison with one particular type of product. But isn't that encompassed by the phrase similar products? Well, but here's the problem, Your Honor, is that the FDA retroactively required a comparison to a specific product being a tobacco-flavored e-liquid. But they affirmatively told applicants in the guidance in 2019 to choose a quote-unquote similar product. In other words, they affirmatively gave the applicants discretion to choose a comparison product. And all over the guidance and the proposed rule, it declares that the FDA is going to give a holistic review to these applications. And so what happened was after the fact, in this July 9th memo in the new nicotine excerpts of the record, it's page 57. It's the same memo in Lotus' record. I'm not sure the record page for Lotus. But it's the same memorandum. July 9th, 2021, this was 10 months after the application deadline, is the first time in the administrative record, and the FDA hasn't controverted this fact, this is the first time in the record anywhere that the FDA declared that these applications were going to be reviewed to determine if they had a comparison with a tobacco-flavored e-liquid. Not any other e-liquid that the applicant thought was a relevant comparison to make a study. I'm sorry to interrupt you, but I want to make sure I understand your argument. Are you saying that when Lotus Vaping and New Nicotine filed their applications, they believed that they could provide scientific evidence and forms of various studies comparing flavored e-liquids to other flavored e-liquids? That there wouldn't be a comparison to tobacco or menthol-flavored products, they just were comparing straight up flavor to flavor? That's exactly right, Your Honor. And if you go back, and I did briefing this case, if you go back and read the 2019 guidance, pages 13 and 14, most substantially, it's got a section on comparison products. And it doesn't anywhere say that the application is going to be rejected unless it includes a comparison to a tobacco-flavored e-liquid. So isn't the FDA trying to determine whether the products are going to provide an appropriate public health benefit in the sense of perhaps reducing tobacco use or eliminating it as opposed to having a new generation of people addicted to nicotine and using tobacco products? So that seems to be the crux of what they're looking at. And I'm not sure why comparing a flavored e-liquid product to another flavored e-liquid product would provide any information on that basic inquiry. Well, because e-liquid products have different, you know, innumerable different characteristics. They have different nicotine contents. They have different flavors, obviously. They have different PG, VG ratios. And so what the 2019 guidance says is, you know, the applicant was given discretion to choose a comparison product. And I'll admit, I mean, I would be the first to say that that is sort of, even with all the guidance they gave, it's still a very open-ended question. But what happened was they took an open-ended guidance question, you know, compare it to a quote-unquote similar product, and they retroactively turned it into, well, if you didn't compare it to a tobacco-flavored e-liquid, which we think is the most relevant comparator, then your application doesn't proceed. That's the problem. And we're not arguing, Your Honor, that they can't apply that comparison and apply that requirement, but it's just a basic requirement of fair notice. You know, my clients can't come in and sue for damages for all the money that they spent for, you know, on preparing this application and conducting these studies, paying consultants to review the literature and prepare this massive application. We can't get damages from the federal government. The only sword we have in this context is to say, look, we're entitled to, at a minimum, a fundamental requirement of fair notice. You've got to tell us beforehand what you were going to review the application for. And so, yes, the guidance left the question open-ended. And it's hard to tell, you know, what, like, who knows what the FDA would have really focused on, you know, and decided was a relevant comparator, but they can't retroactively say, well, we're not going to review the comparison you chose because it wasn't this. Okay, so at the outset of your argument, I thought I'd understand you to sort of back away from the argument that the FDA acted arbitrarily and capriciously because they didn't give you notice that they wouldn't accept certain types of studies, long-term studies, longitudinal studies, that you weren't saying that that was the position now. Did I understand that correctly? Well, what I'm – in a way, to an extent, I would say. I'm not conceding that point because I don't think they really fully reviewed these applications, you know, any of the evidence that was in there. They performed this simple analysis to see if this one comparison was included, and if not, they rejected the application. But I'm saying – I'm trying to make it clear that our argument is not simply saying – because I acknowledge that the record shows that the FDA rescinded this earlier analysis, and in the end, the review documents do show that they considered, quote-unquote, other evidence, not just those two types of studies. But the point I'm making is that they only reviewed the evidence to see if it included this specific substantive comparison, and that that was the change in the substantive requirement that was not provided in fair notice. Thank you. Counsel, you've exceeded your time. Okay. Yes, Your Honor. All right, so we'll hear from Mr. Heyer. Thank you, Your Honor. Eric Heyer on behalf of Lotus Vaping Technologies. Just to be clear, Mr. Navar doesn't represent my client, and I don't represent his. I understand. This is consolidated by the court. I'd like to reserve two minutes for rebuttal as well, Your Honor. Before I start, I just want to let the court know that just yesterday a new document came to light that was obtained through a Freedom of Information Act request by a member of the media that was not in the administrative record in this case. And last night I provided notice to Ms. Talmore that we anticipate filing a motion to complete the administrative record and include that document. Obviously, I didn't expect her to get back to me by the end as to whether they would agree. And I'm not going to argue about that document today, but I just wanted to give you a heads-up that that's going to be a motion that we intend to file in the next week or so, because we feel it is a relevant document that should have been in the administrative record. But going to the point just very briefly about the new evidentiary standard, there's a point I wanted to emphasize as well beyond what Mr. Navar said, which apart from the ultra-specificity of this requirement of comparing the comparative efficacy in promoting smoking cessation of a flavored e-liquid versus a tobacco-flavored one, there was also a significant change in FDA's approach that was also after the fact, which is in the 2019 guidance, FDA said that they would essentially allow and consider evidence in studies that were single-point-in-time studies like consumer surveys, where you're asking consumers what their behavior was, what they did historically at a single point in time. After the fact, and this is in the TPL record, for example, FDA makes very clear that in their view those studies were not robust and reliable, that they had to follow consumers over time, and that was absolutely a sea change in their approach, and it's a change that they unequivocally made after they started reviewing these applications. And that's sort of the second facet, if it were, of the change in the evidentiary standard in the search for, quote-unquote, differential promotion of smoking cessation of combustible cigarettes. I want to be very clear about what LOTUS seeks in terms of relief. All that LOTUS is asking is if the court concludes that FDA had statutory authority to request this comparative efficacy evidence, that the court simply vacate the MDO and remand it back to the agency, and because LOTUS didn't have fair warning of, again, this uber-specific requirement, that LOTUS have an opportunity to go and do these comparative efficacy studies, whether it be a randomized controlled trial, a longitudinal cohort study, or some other type of study, as FDA has required, that compares the flavored e-liquid with the tobacco-flavored e-liquid over time on the effect on consumers on smoking cessation. Is there anything about your client and the arguments and claims you're making here that differs from the arguments that were made on behalf of other companies in the Fifth and D.C. Circuits where those claims were rejected? There are, Your Honor. In the Fifth Circuit case, the Triton case was my case. The D.C. Circuit case was not. But one thing I did want to, and I wanted to get to this, is in the marketing plan in this particular case, and there's this whole issue about the April 2020 guidance. FDA puts a lot of emphasis on the April 2020 enforcement guidance. It wasn't a guidance about PMTAs. You read the dissent in the Triton case, I think, about that and Judge Jones' views on that, which are exactly our views as well. But in this case, and there's a point I wanted to make, the 2020 guidance, and I would draw the Court's attention particularly to ER-95, the 2020 guidance specifically recommends actions that manufacturers take to prevent youth access and uptake to their products. And many of those, and they're listed on that page of the enforcement guidance, and many of those found their way into the marketing plan that LOTUS submitted. And in fact, LOTUS went above and beyond that and had additional things that weren't even referenced in that enforcement guidance by FDA as things that FDA didn't feel were sufficiently adequate to move the needle on youth uptake. So is that your answer, that that's the difference between this case and the cases where the arguments have been rejected? Is that your argument, that the difference is the marketing plan? That's one point, and as I said in the response to the 28J letter as well, I think the Triton majority fundamentally misunderstood an important fact. In fact, we plan on moving for en banc review because they said FDA never required smoking cessation studies. Well, that is the crux and the core of exactly what FDA was looking for was a comparative efficacy smoking cessation study. So I think there was respectfully error there as well in the majority decision. But if that case stands and we find it persuasive, do you lose? No, I don't think so, Your Honor, because here again, the marketing plan has more details, is more robust, frankly, than the marketing plan that was at issue in that case. And there are a lot of things that went above and beyond what FDA— So what are the specific things? Sure, so it's things like not having consumer engagements where the products would be, other than a business-to-business trade shows, right, from selling to a retailer as opposed to a consumer. It's things like having age-gated social media, not using social media influencers, not using humans at all in advertisements, only showing images of the products, so no models, no unvaping using the product, having sales quantity restrictions for online sales, contractual penalties in the written distributor agreements that they had. And the age-gating is very significant. If it's on a social media platform where people that are under 21 can't even see the social media, if it's on Facebook or whatever, and they're not going to see those posts, that's going to have a significant effect on who has—you know, who even has visibility into the fact that this product is out there. But didn't some of the other manufacturers have age-gating protocols also? I don't think that was listed. I don't think that was something that was listed in the—obviously, the record speaks for itself, but I don't think that was one of the things. And I want to make clear, what FDA was referring to in that enforcement guidance was what three or four or five of the largest, either big tobacco companies or companies that are partially owned by big tobacco companies, had said in response to specific inquiries from FDA. The 2020 enforcement guidance, there weren't PMTAs that had been submitted that FDA had started reviewing the marketing plans at that point. Again, this is after-the-fact, post-hoc justification and rationalization that I don't think is appropriate. This is a repurposing of an enforcement guidance document to now justify what FDA did subsequently, and that's, as Judge Jones found, I think that's improper. One other point I want to make to distinguish this case, and I think it's important, from the D.C. Circuit case. And this has to do with the harmless error. The harmless error, and Judge Bressett's particularly— there's a point I want to make about a case that you had that you authored this year, which is the D.C. Circuit essentially said, well, even if there was error in not reviewing the marketing plan, at the end of the day, we find that we can essentially not require this to be remanded on a basis other than the basis stated by the court. And this relies, and the D.C. Circuit cited NLRB v. Wyman Gordon Co., 394 U.S. 759, and it's 766 footnote 6 is the pin site. And this is a significant expansion of that doctrine over and above. In a case recently, I think, Your Honor, where you applied this doctrine, it was Gutierrez-Zaval v. Garland, 32 F. 4th. 806, which is a proper application of the doctrine. When there was an absolute legal certainty that on remand, the outcome is going to be the same because, for example, in that case, the BIA lacked jurisdiction. And so it was absolutely crystal clear, and it wasn't a situation, like NLRB said, where there's an application of the law to a complex set of facts on remand that needs to happen. I think the precedent in this circuit is very clear, that that exception to the Chenery Rule only applies in the narrowest of circumstances, where it's a very clear legal black-and-white answer. And that's not what the D.C. Circuit did. The D.C. Circuit essentially applied an exception that I think, in my view, potentially swallows the rule, even though there's a complex set of facts to which the APPH legal standard must be applied. They said, well, we're going to come up with an alternative rationale that the agency didn't say and not remand it on that basis. And in this circuit, I think a more proper precedent is the Arnold v. Morton case. It's 529 F. 3rd. 1101. It's from 1976. And in that case, the agency at issue essentially said,  I think it was like an oil lease application or something, and the agency basically represented the court, we plan on denying that if it gets remanded. And the court said, you may be telling us that, but still there was error here, and still we are going to remand it. But doesn't it depend on just how different your client's marketing materials are from the ones that have been considered before? Because if they're the same or close to the same, we think we know what the answer is going to be. If there are some material differences, then that's a different question. But FDA never reviewed those. That's the problem. FDA admitted that they never reviewed the marketing plan. So how can – that's the issue. But so then is your position just the fact that they're non-review means it has to be remanded? Well, there are several reasons it has to be remanded, but that's certainly one. I mean, the lack of clear notice, and my client put a lot of effort into the marketing plan and developing that because they thought that was going to be based on the guidance that they had, based on the proposed rule, which also the D.C. Circuit never addressed, right, the proposed rule anyway, in any fashion. But thought that that was going to be significant to the review, and it was going to be a 360-degree review on the merits of the entirety of the application. Instead, we had this litmus test, gatekeeping review, that if you don't have this comparative efficacy evidence, we're not going to look at the rest of the application. Counsel, where did – is it your position that the FDA required you to have the longitudinal studies? Is that your argument? Well, after the fact, they said there are three – there is one bucket, which is it must be what I call comparative efficacy. You must compare the effect of the subject-flavored product versus a tobacco-flavored product on the effect on smoking cessation over time. Did they say you must have that? You must have that. Now it can take the form of a randomized control trial, a longitudinal cohort study, or some other evidence. Right. But none of that was called out beforehand in any manner whatsoever. As Mr. Navar said, it was very vague language. And that's an uber-specific study that – and also beforehand it said, we're not going to require long-term studies. Well, that's a study that's a long-term study. It's following people over time. So that's the – you know, in the words of the Fifth Circuit Motions Panel, that's part of the switcheroo. After – nine months after these applications had to be submitted, in secret, they come up with this new – what they call a standard of evidence upon which to review these applications. Can you submit a new application? We can. The problem is, and part of the reason that these are being appealed, is if – this is a small – this is a small company. If these are in process, if it gets remanded, in practice, FDA has exercised enforcement discretion and not moved to remove those products from the market in the meantime. Whereas, if there's an MDO, they're potentially at risk of enforcement, so essentially they have to come off the market. And that's the benefit, practically speaking, of a remand, is this is a small business and the ability to potentially keep the products on the market in the meantime while they have to go spend all of this money to go do these new long-term comparative efficacy studies that are now called for after the fact. But that – if I may – this distinction between somebody who gets a remand and somebody who can just file a new application, that's ultimately just turning on the discretion of the FDA in terms of its enforcement choices? Well, there are – I guess the point I would make is there are many applications from 2020 that are still sitting there that FDA has done nothing with, and those competing products can remain on the market. Those competitors are able to sell, whereas – But that's a matter of FDA's grace? I mean, that's why that's a remand? Practically, yes. I mean, FDA hasn't taken enforcement action against those products, and so that's why those products, I assume, are still available. So that puts, obviously, our client at a significant competitive disadvantage, if not a threat to their entire business being closed down. Doesn't the statute – isn't statutory language mandatory that if the FDA finds that the evidence that's submitted is not sufficient, they shall deny the application? And then I think it seems it's a separate question whether they then decide to take enforcement action. It is, but this goes to the harmless error point, Your Honor, and my point on that is that this failure to look at the marketing plans, the surveys, anything else other than this narrow bucket of the three sub-buckets that we talked about, is this was prejudicial error that affected the entire process because to the extent the APPH standard, which FDA says it's a sliding scale, they weigh risks and benefits, to the extent that they're not looking at these other things that could reduce the risk of youth uptake, they necessarily artificially increase the showing that they're requiring of benefits to adult smokers, right? And so it's prejudicial error that infects the entire process. It's not something that we can just ignore the rest. I'm sorry, and I know I'm keeping you over time. I asked Judge Rawlinson's indulgence. I want to circle back to the marketing plan issue and make sure I understand your answer. I think one of the issues under the harmless error analysis is if there's anything in the record that suggests that the result of the application would have been different if FDA had reviewed the marketing plan. And you listed some things about your marketing plan that you thought were different from previously rejected plans in response to Judge Bress's question. So is that it? Is that the evidence that we should look at to say, oh, no, if they'd looked at this marketing plan, the result would have been different? Well, there aren't previously rejected plans, Your Honor. This gets sort of… Well, they listed all the things that they found were not effective, including age-gated websites, things that they were finding a tremendous uptake in youth use of these illiquid products, and they listed all sorts of things that had been attempted that were not working. So it seems you have to show that there's something in your marketing plan that's different and that actually would have made a difference in the process to overcome harmless error. Well, yeah, there are. And those are the things that the summary of the marketing plan is on. It's ER-219 to ER-222, so I direct the Court's attention to that. But, again, some of these things are things that FDA specifically recommended on ER-95. These are, quote-unquote, adequate measures that they suggested that market participants undertake in the 2020 enforcement guidance. So to take them at their word and then to be rejected because you did exactly what they are suggesting you do is sort of the epitome of a switcheroo. All right. Thank you, counsel. Thank you, Your Honor. We'll hear from the government. Good morning. May it please the Court. The Courts of Appeal for the D.C. and... Could you state your name, please? I'm sorry, Judge Wilhelmsen. I am Kate Telmore on behalf of the U.S. Food and Drug Administration. The Courts of Appeal for the D.C. and Fifth Circuits recently upheld marketing denial orders similar to those challenged here, rejecting the same arguments briefed here, on remarkably similar records. This Court similarly should affirm FDA's orders because petitioners here failed to satisfy the statutory showing to demonstrate a net public health benefit from the marketing of their products. In the absence of that evidentiary showing, FDA was required to deny their applications. So I'd like to begin with a discussion near the end of counsel's presentation. It is correct that all of these products are being marketed unlawfully, and they have been marketed unlawfully ever since the FDA's deeming rule went into effect. In that deeming rule, FDA stated that manufacturers cannot have settled expectations to market products unlawfully, especially in the face of evolving public health concerns. So the statute itself says that these products cannot be marketed absent a marketing approval. And I think it's critical that the statute directs that FDA shall deny an application in the absence of the public health showing. So it does not allow a manufacturer to have the expectation that it will continue unless and until it has made that showing. And what I think is most important for resolution of these petitions is that these are not close cases. These are cases where petitioners failed to submit any product-specific evidence that would go toward demonstrating a net public health benefit of their own products. But, counsel, what's your response to opposing counsel's both arguments that there was a lack of notice as to what criteria would be used to evaluate those applications? Your Honor, the statute itself gave petitioners the notice that they claimed that they lack. The statute itself says that e-cigarettes, once they were deemed tobacco products, must be shown to benefit existing users of tobacco products to a greater degree than they would harm non-users. This particular argument, the notice argument, is what the D.C. Circuit called far off base and the Fifth Circuit called blatantly wrong. Is this the same? I take Mr. Navar to be making a kind of narrower notice argument about a comparison between flavored and non-flavored end products. Is that what the D.C. Circuit and Fifth Circuit are referring to, or are they referring to more of a broader switcheroo point? I think that both of those courts were saying that the statute expressly commands FDA to compare the risks of various products and that that's what FDA did here. And so they were analyzing the specific comparison that FDA is looking for, which is the comparison between the riskier flavored products and the less risky products, and they found both of those arguments to be wholly lacking in merit. Does the guidance play any role in informing the applicants as to what is to be submitted? Absolutely, Your Honor.  Petitioners' arguments cherry-pick isolated language from the guidance and take it out of context. I'd like to turn to a couple of the things that were provided toward petitioners in the guidance. That guidance stated on pages 12 and 34 that non-clinical studies alone are generally not sufficient to support the required showing. It is likely that applicants will conduct certain investigations themselves and submit their own research findings. The guidance also stressed the importance of comparison. It said that the studies that are submitted should be specific to the product or very similar. Applicants should indicate whether the studies pertain to an identical product or another comparable product and provide a rationale and should compare their products to other products, including other e-cigarettes. Petitioners here failed to do that, so they didn't conform their applications to the guidance itself, and so they shouldn't be heard to complain that the guidance didn't give them sufficient notice. That's even putting aside the fact that the statute itself lays out a showing that new products need to be compared in their risks and benefits to existing products. Why would they have perceived that the agency was directing them to compare flavored e-cigarettes to flavored e-cigarettes rather than comparing them to non-flavored? Why would they have that understanding? Two answers, Your Honor. First of all, the guidance itself stressed the importance of comparison, and it said that applicants should submit evidence that compares their products to those in the same category and subcategory and those in different categories. So it did specifically instruct applicants to submit comparative evidence of products. Now, with FDA's determination that flavored products should be shown more effective than tobacco-flavored products, that's because of the great weight of the conclusive, nationally representative, overwhelming evidence that flavored products pose a disproportionate risk to youth. So applicants were both told at the outset that they would need to make these types of comparisons, and FDA provided sufficient evidence and analysis to show that the flavored products are disproportionately harmful to youth. So what would they need to show? I mean, they didn't make the showing, but what do you think they needed to do that would have been sufficient here, or is there nothing they could have done? Your Honor, a number of manufacturers have submitted the type of evidence that FDA is looking for. Those applications have proceeded to further scientific review, such that FDA is evaluating that evidence to determine whether it's sufficient. So it's not the case that manufacturers across the board were stymied and didn't know what type of evidence to submit. So what does that look like? I think we both maybe have the same question. What does that evidence look like? Yes, Your Honor. So FDA granted applicants some flexibility. In fact, the D.C. Circuit specifically said that instead of limiting applicants to the two types of evidence that are typically required in scientific determinations, those being the randomized control or the longitudinal cohort studies, FDA will evaluate other evidence. But specifically, that evidence needs to be directed toward showing that flavored products, due to their disproportionate harm on youth, need to be more beneficial to existing users of tobacco products than their tobacco-flavored counterparts. In other words, that the greater risks need to be benefited balanced with greater benefits. And so if it is the case that flavored products have more of a stickiness with smokers, where when they try a flavored electronic cigarette product, they are more likely to stay away from the combustible cigarettes and stick to that versus a tobacco-flavored electronic cigarette that might be used more interchangeably with a cigarette, that's the type of evidence that would show a greater benefit. And again, some manufacturers have provided just that type of evidence that's now being evaluated to make sure that it's robust and reliable in the further scientific review process. Here we have cases where the petitioners not only didn't make that showing of a greater benefit versus tobacco-flavored, the petitioners here didn't submit any evidence that was specific to their products. So, counsel, on ER-227, it appears that the FDA suggested that there could be data from the public literature that was applicable to the e-cigarettes or extrapolate from short-term studies into long-term consequences. So that would be some examples of what could be done short of doing the actual longitudinal studies or long-term studies? Yes, Your Honor, that's precisely the type of discretion and flexibility that FDA has given manufacturers. And so the D.C. Circuit looked at that and found that while FDA has said that it would allow applicants to submit different types of studies, it won't relax the scientific rigor it's looking for. And so that statement in the guidance about looking at published literature, the broader context there says that there are limited studies on electronic cigarettes, at least at the time that was put out, and that it is likely applicants will conduct some investigations themselves. But if there is an established body of evidence showing benefits of these products and an applicant links that information, shows that the products are similar, and then extrapolates with short-term studies to show that they're applicable to their own products, that might suffice. But that doesn't mean that just submitting academic publications in and of themselves with nothing to tie to their own products is sufficient for the statutory standard. We asked Mr. Heyer, you know, couldn't your client just reapply? You know, now that you have greater clarity on what the FDA is looking for, couldn't you just submit a new application? And he was explaining that some of the different enforcement priorities of the FDA and how some people may be allowed to sell these things or at least may not face enforcement actions. Can you speak to that? I think you were addressing that sort of when you first got up, but can you come back to that issue? Yes, Your Honor. It certainly is the case that petitioners could submit another application, and if they wish to continue marketing their products, that's what they would need to do. That doesn't mean they're entitled to a further 6 months, 18 months, 2 years of enforcement discretion on a product that's been unlawfully marketed for 6 years now. So it is the case that they wouldn't have an exercise of enforcement discretion, and I can't speak to how FDA would act on products in that instance. But they can submit another application, and in fact, that's what the statute requires. I think it's critical here that it's our position that there's no authority under the APA to give plaintiffs a do-over with additional enforcement discretion when they fail to meet the statutory standards set by Congress. Here I think that we should talk briefly on the actual evidence that was submitted by the petitioners. As I mentioned, the evidence that they submitted was general published literature that just talked about e-cigarettes generally. It didn't analyze their products. It didn't reference their products. It had no bearing on their specific products. They included no bridging information to connect that information to their products, and the survey that LOTUS says were of its own customers. At ER50, applicants, not a single one on what they submitted show that their own products are the brand of choice being used. So there's nothing that actually speaks to their own products. Were it the case that FDA could look at general published literature on e-cigarettes across the board and determine that flavored e-cigarettes were beneficial for the public health, that would indicate that FDA would need to grant an across-the-board approval for all e-cigarettes because that published literature fails to differentiate between products. Isn't the FDA required to do an individualized examination of the application and the information that's submitted? And the petitioners have argued that the similarities, the marked similarities between the TPLs that they received suggest that instead the FDA was just doing across-the-board blanket denials and not actually doing any sort of individualized review of their petitions. And I do see that those TPLs are indeed very similar. How do you respond to their argument? Your Honor, the fact that the TPLs are very similar does not indicate that the FDA failed to conduct an individualized review. The FDA did conduct an individualized review and looked for whether petitioners had submitted evidence that could possibly carry their statutory burden. In the absence of that evidence, there wasn't any need to proceed to the further scientific review. In terms of why the TPLs are so similar, this is, as you're aware, a very lengthy document that surveys a wide variety of published academic literature. This is a substantial amount of work product with a majority of findings that are applicable to various products. In other words, when FDA was surveying the literature on showing how these products attract youths and harm youths by causing addiction of new users, that is applicable to various products. FDA also is instructed by the statute to consider all of the evidence before the Secretary in making each individual determination. So when FDA surveys general literature on benefits to adults, that also is applicable across different applicants. So FDA's general analytical mode may be generally applicable. And in that case, it's appropriate to use a document that explains that. But the documents also explain at pages 14 and 15 of the TPLs why a particular application failed. And here, for both petitioners, it's the complete failure to submit product-specific evidence that could possibly meet the statutory standard. I would also point out that when Mr. Navar was speaking earlier, he acknowledged that there are a variety of characteristics between flavored e-cigarette products. That's exactly why product-specific evidence is required, because FDA can't just look at general literature, find that e-cigarettes might be less harmful to smokers. A fact that FDA acknowledged. And then grant approval of all of them en masse. It has to see evidence specifically tied to the product to show that these products are going to help adults more than they harm children. By what metrics do the flavored products differ from each other? The flavored products differ from each other in both the flavors themselves and how attractive they are to smokers, in their nicotine concentrations, in their potentially harmful constituents concentrations, and other kind of chemical characteristics. And so what FDA found when it reviewed the general published literature on flavored products and how they may attract adults, it found that there are academic studies that look at how smokers are attracted to electronic cigarettes. And the findings were very mixed on whether flavored products are more attractive to adults than they are the tobacco-flavored products. So it didn't find any kind of scientific consensus. Some studies pointed one direction, some pointed another. And so in the absence of a consensus scientifically, petitioners need to come forward with some evidence that their products are going to aid public health, just as Congress required. Can I just ask, on the so-called fatal flaw principle or memo, has that been formally withdrawn or just been withdrawn in practice? What's your position on that? It was superseded, Your Honor. It was superseded in that the August memo instructed reviewers to look in applications for other evidence, other than only randomized control trials or longitudinal cohort studies. And what's most important here is that the TPL memos reflect that FDA did just that. It looked at both of these applications. It determined that there wasn't any other evidence that might meet the statutory burden. So although the fatal flaw memo was superseded, it's obvious from the TPLs that it wasn't applied here. So, Counsel, the August memo was itself then withdrawn shortly after it was issued. So how does that affect your position that that memorandum superseded the fatal flaw memo? I don't think it impacts the analysis of whether the fatal flaw memorandum no longer was applicable at the time that these applications were reviewed. But again, what I think is most important is that the TPLs themselves reflect that the reviewers looked at the applications for other evidence and didn't find any. As the D.C. Circuit found, FDA didn't reject these applications for failure to submit a particular type of evidence, but because the evidence they submitted wasn't scientifically valid and robust and reliable. The manufacturers here failed to meet a statutory standard that has consistently been applied by FDA. Switching gears a little bit, if we were to conclude that the FDA's failure to review the marketing plans was arbitrary and capricious, how could we determine that was harmless error? Your Honor, I think that it must be harmless error on this record because I think, as an initial matter, I think it's important to note that while Counsel a few minutes ago was speaking about the specifics of the marketing plan, his briefing didn't discuss the specifics of the marketing plan. It certainly raised and briefed the issue whether FDA committed error by not reviewing the marketing plan, and I certainly acknowledge that it suggested that FDA over-evaluated the risk to youth. But what is important here is that, first of all, Petitioner didn't discuss the specifics of his marketing plan in his briefing and how it would work where the previous guidance did not. But most importantly, it's reversible error here because the Petitioners didn't show that they would receive marketing authorization had FDA considered the plans. What that means is that a marketing plan is necessary but not sufficient to get approval. A marketing plan, no matter how robust, cannot possibly warrant approval in the absence of the statutorily required showing of a net public health benefit. And so here, regardless of the specifics of the marketing plan, where Petitioner submitted no evidence that went toward the actual statutory standard Congress directed them to make, they couldn't possibly get approval on the basis of a marketing plan alone. So your position is basically the marketing plan is a mitigation effort, it's not affirmative evidence of a health benefit? Absolutely, Your Honor. The marketing plan is necessary but not sufficient. Specifically here, the Fifth Circuit noted that Congress passed the Tobacco Control Act because marketing restrictions simply weren't working. As the D.C. Circuit noted, the Petitioners' argument is essentially faulting FDA for considering evidence that's come in since 2019 that shows that marketing restrictions haven't been enough to keep these products out of the hand of youth. The record itself shows that youth do tend to obtain e-cigarette products from social sources rather than walking into specialty vape shops and buying them or ordering them online. And so a marketing plan for a product that's otherwise shown to have the potential to benefit adult smokers is important to keep those products away from youth. But a robust marketing plan couldn't possibly overcome the failure to submit evidence required by the statute. That's why it's reversible error. Not because the marketing plan itself simply fell short, although we believe that the Petitioner hasn't shown that it was meaningfully different than the measures FDA has found inadequate, but most importantly, it just couldn't possibly tip the scales where they failed to submit the evidence required by statute. That's why there's no reversible error. I would point out that on a very similar record, Judge Katsas' concurrence in the D.C. Circuit found that there was no serious argument here that the FDA's failure is prejudicial as required under the APA on a record like this, where there isn't evidence that would go toward the statutory standard itself. And the Petitioners here don't claim to have proposed anything that differed materially from the restrictions that FDA and industry already had implemented in response to the 2020 guidance. And in closing, I would just like to touch again on the agency's 2019 guidance. I think that guidance, when read as a whole, clearly demonstrates that the Petitioner's notice claims fail because, besides the fact that the statute itself directs the exact type of comparison that FDA here is looking for, that guidance specifically indicated that manufacturers should submit comparative evidence on their own products and that evidence submitted should be specific to the products themselves. We ask that this Court affirm FDA's denial orders. Thank you. Thank you. All right, rebuttal. Mr. Nabar? Yes, thank you, Your Honor. First, counsel for the FDA repeatedly refers to the statutory standard. A couple points on that. The statute nowhere discusses, yes, it does nod to a comparison of various types of users and non-users of tobacco products. That's fair enough. The statute does not impose this narrow substantive requirement to compare your products to a tobacco-flavored e-liquid. That was a retroactive invention by the FDA intended for them to be able to clear the backlogs of these thousands and thousands of applications. Why is that not fairly encompassed within the statute? No, Your Honor, it is. I will acknowledge fully it is a fair application of the statutory standard if that's what the FDA wants to say, how they're promulgating and interpreting that standard. But they have to tell applicants before the fact in order for them to submit the appropriate evidence. And I would point to a case we cited in our brief as United States v. AMC Entertainment from this circuit, 549 Federal 3rd, 768 and 69. This is a 2008 case that the analysis is really on point here. Basically, the FDA tried to, I mean, the government in that case tried to retroactively impose and enforce a feasible interpretation of a regulation after these movie studios had built these different theaters, you know, based on just their understanding of the regulation sort of broadly. And it's the same thing here. I will acknowledge that the FDA can go back and require this specific comparison to a tobacco-flavored product if they want to, and that's a fair interpretation of the comparative requirement that they can impose, but they have to tell people that beforehand. And they cannot affirmatively tell applicants to choose a similar product to compare your product to. And that's what they did in the 2019 guidance. Counsel, what about the government's argument that you selectively looked at some of the requirements and didn't consider all of them? And if you look at all of the requirements, all of the provisions, that there's fair notice? Well, thank you for the question, Your Honor, because I don't think that was a fair characterization of our arguments. We didn't take anything out of context. If you read the 2019 guidance in whole, which is the last document in our addendum filed with our appellate brief, again, I've discussed it in my briefs and I've discussed it here. There's a section on comparison products, and there's a subsection within that that discusses comparisons for e-liquids, such as an issue here, and there is no place in there where they tell people that it is an absolute prerequisite to choose this specific comparator. This is just a very logical and rubber-to-the-road kind of point for a small business that's trying to comply with regulations. You can't tell people to choose a comparator product among the thousands and thousands of variability that's out there. And I could discuss some of those if the court wants to know, but it's not fair to tell people, choose something that you think is used in a similar manner and make a comparison and make your best case to us, and we'll review your application and apply the APPH standard. They can't retroactively declare that, well, we're not even going to look at your evidence and your bridging analysis because you didn't compare it to a tobacco-flavored e-liquid. That was nowhere in the record before July of 2021. It's not in the statute either, obviously. And once an agency promulgates their interpretation of a requirement, the applicants, you know, the regulated public is entitled to rely on that. In fact, they're required to. Counsel, let me ask you this. How do you distinguish your argument from the arguments that were rejected by the Fifth and D.C. Circuits? Thank you, Your Honor. In the D.C. Circuit, the prohibition case was my case, and the D.C. Circuit did analyze the argument I'm making here on fair notice, but they completely missed this point. And at one point they mischaracterized what I said in oral argument. I don't think that was – I'm not saying that's intentional. I think they missed – and I'll explain that in a moment. But first, again, like I'm saying, the AMC Entertainment case is on point. Well, but if we find the D.C. reasoning persuasive, do you lose? Well, no, because for a point that's in our brief but I haven't highlighted yet today, but my client, New Nicotine, makes unflavored base nicotine salt e-liquids. They don't have a flavor already added, unlike the vast majority of other products that have been reviewed and denied. Well, but they're suitable for adding flavor, so I'm not sure that that makes a difference. Well, that's fair enough, Your Honor, that's true. But excerpts of the record, page 800 to 802, our application discusses how the e-liquids, which the application has several pages with references to scientific literature explaining how, with respect to these types of e-liquids, they're not readily usable with the same variety of flavors that are available in regular e-liquids. And that's not really before the court because the FDA didn't review it. And they didn't provide that analysis, and they can't retroactively say, well, something we didn't review and find deficient is actually deficient now that we're here in the court of appeals. I'm not sure that that might be a distinction without a difference because if you take the flavor out and then the consumer or the user is able to just add whatever flavor he or she wants, I'm not sure that that makes a difference in terms of evaluating the product. Well, Your Honor, what I'm saying is, yes, and the standard for this is the FDA has promulgated a standard for this where they say, you know, it's okay. Just the fact that the flavors are not already added is not dispositive. I agree. The standard is, is it reasonably foreseeable that the consumers will use flavors with them or what types of flavors are reasonably foreseeable to be used with these types of e-liquids? And what I'm suggesting and what our application points out with reference to scientific studies is that these nicotine salt variety of e-liquids that new nicotine makes are not usable, are not used in the consumer market with the same variety of flavors by a wide margin. It's very different than other types of e-liquids. I thought the record reflected those e-cigarettes were marketed with the ability to use flavors and some of the more popular flavors at that. Is that not true? Well, the FDA does have that reference to a portion of new nicotine's website in its brief. But, again, without, it's impossible for me to refute that when there's no analysis from the agency that gets into, you know, the real differences here. That was something that the FDA pointed out on appeal in their brief, but they can't retroactively, you know, paper up their analysis or say that it wouldn't have mattered. All right. Counsel, don't they say that you had a more fundamental flaw? I understood the argument from the government's counsel to be that your applications weren't even close to sufficient because you didn't include any comparison of your own products, your own specific products, which would seem to be a problem before you even determine what you're comparing it to, if it's not a comparison of your own product. So maybe I misunderstood their argument, but how do you respond to that? No, you're right. That's what counsel said, and that is not correct. We submitted hundreds and hundreds of pages of, you know, for the scientific review, the health risk investigation part of the PMTA, and large portions of that, and it's in the table of contents. One portion is page 800-802 discussing the difference with these kind of e-liquids where they're not, you know, readily usable with a lot of different flavors. But there is discussion of new nicotine's own products in the health risk investigation portion of the application, and FDA's review did not analyze that. They simply looked at whether it included this comparison to a tobacco-flavored e-liquid, and they said if it doesn't, it's not proceeding further in scientific review. So, I mean, FDA can, on remand, they could say, they could review it as they said they would under the 2019 guidance and find it deficient, but they can't argue that all that evidence is deficient here when that wasn't part of the analysis in the check-the-box form that's before the court. All right. Thank you, counsel. You've exceeded your rebuttal time. Mr. Heyer. Thank you, Your Honors. A few brief points. Going back to the question about why did conceptually Lotus and similar applicants, by the way, I'd like to point out that FDA has said over 95 percent of applications were essentially rejected on this basis. So if this was crystal clear to applicants, the entire industry essentially missed this. If the statute was so clear that it was the standard, then almost all of these have been rejected. And frankly, those that are left is because they had the dumb luck of having a tobacco-flavored product in a study with a flavored product, and that allowed them to stay in the queue, as it were. But anyway, the reason conceptually that these applicants wouldn't think to compare a tobacco-flavored to a flavored product is, for example, for Lotus, 93 percent of what it sells, and it only sells to adults. There's zero evidence that FDA has cited or out there, period, that youth have ever bought their product. Ninety-three percent of it is non-tobacco-flavored. It's a very small sliver of what they sell. So it's not just common sense that, oh, we're going to do a comparison to a tobacco-flavored product as opposed to all the other flavors that they sell. That's overwhelmingly what the adults buy, what the former smokers buy, and that's what the survey data and the literature bear out. Also, FDA has sort of this heads-eye-win-tails-you-lose approach. There are arguments about the marketing plan, and there are arguments about product-specific evidence. There was product-specific evidence, and I just want to contextualize a little bit, and these things are in the literature review. If all existing smokers, there's a study that says all existing smokers switch to these products, that there would be between 1.6 and 6.6 million premature deaths avoided in the United States over 10 years. That's how much less harmful these products are. The U.K.'s Royal College of Physicians has said they're 95 percent less harmful than combustible cigarettes. And one of the points of the study was that the study was done in the U.K. Ginsburg. But that information could be presented to the FDA. It's in there. It's in there, Your Honor. It's part of the literature review. That's the point. Well, but the literature, I think that the literature had to be extrapolated onto your product. That's the difficulty. Just the general statistics in literature didn't meet the criteria. But, Your Honor, my client did, for example, have harmful and potentially harmful constituent testing for their products that compared them to combustible cigarettes and showed, just like all the literature does, that these products are in that substantially, I mean, realms of difference physiological risk that they pose because of the lack of these harmful and potentially harmful substances. But that's getting into how to evaluate the scientific data. And that's something that we are not here to do today. Well, but the FDA didn't look at that, right? Because they only look for this narrow, one of these three sub-buckets of this narrow bucket of comparative efficacy evidence. And so they avoided looking at all the rest of this. And that's why there's prejudicial error because the weighing of the risks and the benefits got askew because they didn't look at the marketing plan. They didn't look at the HPHC data. They looked at nothing else in the application other than this after-the-fact requirement for this comparative efficacy data. So I just wanted to, and going back to the point that counsel raised about the surveys and literature review and what they may say about the stickiness of these products, FDA did say, again, it's a heads-I-win-tails-you-lose interpretation of their guidance document in this argument about cherry-picking because they did say it may be appropriate to rely on the literature. In fact, the 2018 public meeting that they had with applicants, they specifically said that. No new studies need to be required necessarily for an ENDS product application. That's a point that the D.C. Circuit and the Fifth Circuit brushed over. And before the D.C. Circuit in a previous case, I think it was in 2018, FDA also emphasized the fact that they would be willing to look at the literature on these products. So, again, it's heads-I-win-tails-you-lose regardless of what we're talking about, the marketing plan or we're talking about the ability to reference literature. That's unfortunately, that was the Nickapier Labs case, 944F3, 267, the pin site is 282. So, again, FDA as well is cherry-picking certain excerpts to try and say, no, it has to be product-specific evidence, and we let people know about that. But I wanted to make sure the court understands and properly contextualizes that tobacco-flavored ENDS products, and this is industry-wide, are a very small sliver of the sales. Yet, nine months after the fact, that is now the be-all, end-all comparator that applicants were required to run these studies on. All right, thank you, counsel. Thank you. Thank you to all counsel for your helpful arguments in this case. The case just argued is submitted for decision by the court.
judges: RAWLINSON, BADE, BRESS